**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL DERIENZO,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 2361 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying the application of Michael Derienzo for Supplemental Security Income under Title XVI

of the Social Security Act. This case has been assigned to the undersigned United States

Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the

parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint.

(Document Number 14). Defendant has filed a Brief in Support of the Answer. (Doc. No. 16).

## Procedural History

On May 5, 2008, plaintiff filed his application for benefits, claiming that he became unable

to work due to his disabling condition on January 21, 2007. (Tr. 89-93). This claim was denied

initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion

by an Administrative Law Judge (ALJ), dated November 3, 2009. (Tr. 39, 5-15). On November

4, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3). Thus, the decision

of the ALJ stands as the final decision of the Commissioner.  <u>See</u> 20 C.F.R. §§ 404.981, 416.1481.

**Evidence Before the ALJ**

**A.    ALJ Hearing**

Plaintiff's administrative hearing was held on September 28, 2009.  (Tr. 18).  Plaintiff was present and was represented by counsel.  (<u>Id.</u>).

The ALJ examined plaintiff, who testified that he lived in a home with his wife.  (Tr. 19).  Plaintiff stated that his wife's two children lived with them part of the week.  (<u>Id.</u>).  Plaintiff testified that his wife was working.  (<u>Id.</u>).

Plaintiff stated that he earned a GED, and attended college for five months to obtain heating and cooling certification.  (<u>Id.</u>).

Plaintiff testified that he was a self-employed contractor.  (<u>Id.</u>).  Plaintiff stated that he did not receive any training to be a contractor, but learned skills from his father.  (<u>Id.</u>).

Plaintiff testified that he worked as a maintenance supervisor, and that he supervised three people at this position.  (Tr. 20).

The ALJ noted that plaintiff reported to the SSA that he had been performing self-employed carpentry work and earning $1800.00 a month since August 1, 2008.  (<u>Id.</u>).  Plaintiff stated that he had not worked since he was injured on January 1, 2007.  (Tr. 21).  Plaintiff testified that his ex-wife completed the form in which it was reported that he started working on August 1, 2008.  (<u>Id.</u>).  Plaintiff stated that he re-married one week prior to the hearing.  (<u>Id.</u>).  Plaintiff's attorney indicated that he would investigate this matter.  (<u>Id.</u>).

Plaintiff testified that he was not paying child support.  (Tr. 22).  Plaintiff stated that he

dated his current wife for one year before getting married.  (Tr. 23).  Plaintiff testified that his

wife was supporting him.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he underwent his first back

surgery in February of 2006.  (Id.).  Plaintiff stated that he returned to work a few months after

surgery and was doing fine.  (Id.).

Plaintiff testified that he injured his back while he was working shoveling snow on January

21, 2007.  (Id.).  Plaintiff stated that he sought treatment at St. John's Mercy.  (Tr. 24).  Plaintiff

testified that he followed-up with his doctor, who referred him to Dr. James Coyle through

workers' compensation.  (Id.).  Plaintiff stated that he underwent another discectomy[1] and fusion

on April 1, 2007.  (Id.).

Plaintiff testified that his workers' compensation case was recently settled, and that he had

not received the funds at the time of the hearing.  (Id.).

Plaintiff stated that he had not worked at all since his April 1, 2007 surgery.  (Tr. 25).

Plaintiff testified that Dr. Coyle released him on September 28, 2007.  (Id.).  Plaintiff stated that

his employer stopped paying for his treatment at that time, and that he had no insurance.  (Id.).

Plaintiff testified that he paid for his medical care out of his pocket.  (Id.).

Plaintiff testified that he experienced some residual problems following surgery.  (Id.).

Plaintiff stated that he experienced lower back pain around the hip area.  (Id.).  Plaintiff testified

that he was able to stand on concrete for five to ten minutes, and he was able to stand on carpeted

floors for fifteen to twenty minutes.  (Id.).  Plaintiff stated that he was able to walk approximately

---

[1]Excision, in part or whole, of an intervertebral disc.  Stedman's Medical Dictionary, 550
(28th Ed. 2006).

a quarter of a mile in about twenty minutes. (Tr. 26). Plaintiff testified that his back aches after walking this distance. (Id.).

Plaintiff stated that he takes ibuprofen for his back pain. (Id.). Plaintiff testified that he does not take any prescription pain medications. (Id.).

Plaintiff stated that he does not sit often, and that he has to frequently change positions due to back pain that runs down the right side of his buttock and down his leg. (Tr. 27). Plaintiff testified that his back pain goes all the way down to his foot. (Id.). Plaintiff described his pain as a "small electric jolt." (Id.). Plaintiff testified that his pain comes and goes. (Id.). Plaintiff stated that he experiences this jolt-like pain when he turns his body a certain way. (Tr. 28).

Plaintiff testified that he also experiences a constant aching pain. (Id.). Plaintiff stated that this pain ranges from a five to a ten on a scale of one to ten. (Id.). Plaintiff testified that he experiences severe pain about twenty times in an average week. (Tr. 29). Plaintiff stated that this severe pain is sometimes relieved when he applies heat or ice. (Id.). Plaintiff testified that the severe pain lasts anywhere between three hours to all day. (Id.).

Plaintiff stated that he was only taking over-the-counter pain medication because he did not have insurance. (Tr. 30). Plaintiff testified that his doctor did not want to treat him due to his workers' compensation case, and told him to see his surgeon, Dr. Coyle. (Id.). Plaintiff stated that Dr. Coyle would not prescribe pain medication because he indicated that plaintiff should have reached maximum medical improvement. (Id.). Plaintiff testified that Dr. Coyle advised him to take over-the-counter ibuprofen for his pain. (Tr. 31).

Plaintiff stated that he was unable to bend forward completely. (Id.). Plaintiff testified that he did not lift anything heavier than five pounds. (Id.). Plaintiff stated that there were times

he was unable to lift even five pounds. (Tr. 32). Plaintiff testified that his wife occasionally has to help him dress because he is unable to bend over or lift his leg high enough to put on his shoes. (Id.).

Plaintiff stated that he spends his days trying to alleviate his pain. (Tr. 32). Plaintiff testified that hot showers occasionally help his pain, although they sometimes increase his pain. (Id.). Plaintiff stated that he periodically walks from the kitchen to the living room to avoid becoming stiff. (Id.). Plaintiff testified that he is unable to perform most household chores due to his pain. (Tr. 33). Plaintiff stated that he occasionally dusts. (Id.). Plaintiff testified that he does not perform any yard work. (Id.).

Plaintiff stated that he used to enjoy fishing, but he had not fished since his injury. (Id.).

Plaintiff testified that he did home exercises that were prescribed to him. (Id.). Plaintiff stated that he spent ten to fifteen minutes a day doing exercises. (Tr. 34).

The ALJ then re-examined plaintiff, who testified that he had been in prison three times for three separate stealing charges approximately fifteen to twenty years prior to the hearing. (Tr. 35).

Plaintiff stated that, when he was dating his new wife, they would just sit around the house. (Tr. 36). Plaintiff testified that he was unable to leave the house. (Id.). Plaintiff stated that, although he had driven to the hearing, he had not driven in approximately nine months prior to the hearing. (Id.).

After the hearing, the ALJ made some observations in an addendum to the hearing record. (Id.). The ALJ noted that she had observed plaintiff leaving the hearing and that he moved very freely, and then got into a small car and drove away. (Tr. 37). The ALJ stated that plaintiff was

accompanied by a woman, yet she did not drive. (Id.). The ALJ next noted that plaintiff's medical records indicate that plaintiff was walking up to six miles at one point. (Id.). The ALJ stated that plaintiff's statements of functional limitations were very inconsistent with the record. (Id.). The ALJ pointed out that plaintiff's doctor refused to prescribe pain medications. (Id.). The ALJ concluded that the record "clearly indicates to me that he's not suffering the excruciating pain that he keeps telling us he's experiencing." (Tr. 38).

## B.    Relevant Medical Records

The record reveals that plaintiff received treatment at Pain Management Services from January 20, 2006, through March 1, 2007. (Tr. 170-84). On January 20, 2006, plaintiff reported that he had been involved in a motor vehicle accident on December 26, 2005, after which he started experiencing stiffness and pain in the right hip and lower back. (Tr. 173). The impression of Robert Allen, M.D. was chronic low back pain, possible lumbar[2] disc origin. (Tr. 176). Dr. Allen administered a lumbar selective nerve root block on January 26, 2006. (Tr. 177). Plaintiff underwent an MRI of the lumbar spine on January 29, 2007, which revealed a small amount of contrast enhancing soft tissue insinuated between the L5-S1 disc and the right S1 nerve root, consistent with post-operative fibrosis;[2] and a diffuse annular[2] disc bulge at the L5-S1 level.

---

[2]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See Medical Information Systems for Lawyers, § 6:27.

[2]Formation of fibrous tissue as a reparative or reactive process, as opposed to formation of fibrous tissue as a normal constituent of an organ or tissue. Stedman's at 726.

[2]Ring-shaped. Stedman's at 113.

(Tr. 168). There was no evidence of herniation or significant spinal stenosis.[3] (Tr. 169).

Plaintiff saw James J. Coyle, M.D., a spine surgeon, on February 28, 2007, for evaluation of acute onset back and bilateral lower extremity pain. (Tr. 227). Plaintiff reported back pain beginning on January 21, 2007, after shoveling snow while working as a maintenance supervisor for Park Meadows Apartments. (Id.). It was noted that plaintiff had undergone a L5-S1 microdiskectomy with Dr. Peter Yoon on February 15, 2006, and that he did very well following surgery and returned to work with unrestricted activities. (Id.). Dr. Coyle stated that a review of plaintiff's MRI revealed a small recurrent disc herniation at L5-S1. (Tr. 228). Upon examination, Dr. Coyle noted paralumbar tenderness and gluteal pain. (Id.). Plaintiff's worst pain was in his back radiating to his buttock and posterior thigh. (Id.). Plaintiff's straight leg raise test bilaterally caused severe back pain. (Id.). Dr. Coyle recommended that plaintiff undergo an epidural steroid injection, and stop physical therapy. (Id.). Dr. Coyle indicated that plaintiff was unable to work at that time. (Id.). Dr. Coyle excused plaintiff from work between February 28, 2007, and May 14, 2007. (Tr. 210-12).

Plaintiff presented to Pain Management Services on March 1, 2007, with complaints of back and leg pain. (Tr. 180). Upon examination, plaintiff had full range of motion of the lower extremities, and full strength and muscle tone. (Tr. 181). Plaintiff's straight leg raise test was positive on the left and right. (Id.). The assessment of Stephen Schmidt, M.D., was postlaminectomy syndrome-lumbar regions. (Id.). Dr. Schmidt administered a lumbar epidural steroid injection. (Id.).

Plaintiff underwent an MRI on March 12, 2007, which revealed status post right L5-S1

---

[3]Narrowing of the spinal canal. Stedman's at 1832.

- 7 -

laminotomy[4] and diskectomy, with no clear evidence of recurrent disc herniation.  (Tr. 234).

On April 2, 2007, Dr. Coyle performed a revision right L5-S1 microlumbar discectomy, and anterior lumbar arthrodesis.[5]  (Tr. 229).

A lumbar spine x-ray dated May 14, 2007, revealed a stable anterior fusion at L5-S1.  (Tr. 242).

Plaintiff saw Dr. Coyle for a follow-up on May 14, 2007, at which time plaintiff reported significant improvement since surgery.  (Tr. 221).  Plaintiff was taking no pain medication, and was walking a mile-and-a-half daily.  (Id.).  Upon examination, plaintiff had good strength in both lower extremities.  (Id.).  Dr. Coyle recommended that plaintiff continue with physical therapy, and double his walking program.  (Id.).  Dr. Coyle excused plaintiff from work from May 14, 2007, through June 11, 2007.  (Tr. 209).

Plaintiff presented to Dr. Coyle on May 23, 2007, at which time plaintiff complained of aching pain in his legs.  (Tr. 220).  Plaintiff was walking on a regular basis and was taking no pain medication.  (Id.).  Dr. Coyle prescribed Elavil[6] for plaintiff's leg pain, and to help him sleep.  (Id.).  Dr. Coyle excused plaintiff from work from May 23, 2007, through July 25, 2007.  (Tr. 207).

On June 13, 2007, plaintiff reported that he overdid it in physical therapy and complained of pain radiating into both legs.  (Tr. 219).  Upon examination, plaintiff had good motor strength

---

[4]Excision of a portion of a vertebral lamina resulting in enlargement of the intervertebral foramen for the purpose of relieving pressure in a spinal nerve root.  Stedman's at 1046.

[5]The stiffening of a joint by operative means.  Stedman's at 160.

[6]Elavil is an antidepressant indicated for the treatment of depression and insomnia.  See WebMD, http://www.webmd.com/drugs (last visited March 13, 2012).

in both lower extremities, and was able to forward flex to about fifty degrees.  (Id.).  Dr. Coyle indicated that plaintiff was able to mow the grass.  (Id.).  Dr. Coyle recommended that plaintiff start a very aggressive walking program and build up to three miles a day.  (Id.).  Dr. Coyle prescribed Celebrex,[7] Elavil, and Lyrica,[8] and discontinued physical therapy.  (Id.).

On July 30, 2007, plaintiff reported that he was about fifty percent improved following surgery.  (Tr. 218).  Plaintiff walked three miles a day and took Lyrica and Soma[7] at night.  (Id.).  Plaintiff reported intermittent low back pain and cramping in his legs.  (Id.).  Upon examination, plaintiff's straight leg raise test was negative, and he had good flexibility and motor strength. (Id.).  Dr. Coyle stated that plaintiff was doing well and did not need any physical therapy.  (Id.). Dr. Coyle indicated that plaintiff should not lift greater than twenty pounds at that time, and should do no impact activities such as operating heavy machinery.  (Id.).  Dr. Coyle discontinued the Soma and Lyrica.  (Id.).

On August 8, 2007, plaintiff complained of acute onset of severe back pain after leaning over and picking up a bag of groceries.  (Tr. 217).  Upon examination, plaintiff had tenderness to palpation in the lumbar spine, normal strength and sensation, and no nerve root tension signs. (Id.).  Dr. Coyle's impression was acute lumbar strain.  (Id.).  Dr. Coyle recommended that plaintiff attend physical therapy.  (Id.).  Dr. Coyle indicated that plaintiff could return to work with restrictions of no lifting and no impact activities.  (Tr. 205).

---

[7]Celebrex is a non-steroidal anti-inflammatory drug indicated for the treatment of osteoarthritis.  See Physician's Desk Reference (PDR), 2981 (63rd Ed. 2009).

[8]Lyrica is indicated for the treatment of nerve pain.  See PDR at 2527.

[7]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions.  See PDR at 1931.

On August 27, 2007, Dr. Coyle indicated that plaintiff's legs were doing much better than prior to surgery, and that plaintiff had some residual low back pain. (Tr. 216). Plaintiff's x-rays revealed that his fusion was consolidating very well. (Id.). Upon examination, Dr. Coyle noted some tenderness, but normal strength and sensation. (Id.). Dr. Coyle prescribed ibuprofen and Elavil. (Id.). Dr. Coyle indicated that plaintiff should not lift greater than twenty-five pounds, and should do no repetitive bending at the waist of greater than forty degrees. (Id.). Dr. Coyle recommended that plaintiff start conditioning exercises, and noted that plaintiff should be at maximum medical improvement in about four weeks. (Id.).

On September 24, 2007, plaintiff reported that he was doing very well, was ready to return to work, and that he did not want or need any restrictions. (Tr. 215). Upon examination, plaintiff was able to touch his toes without difficulty, walk on his toes and his heels, and squat. (Id.). Plaintiff's x-rays revealed a solid, mature fusion. (Id.). Dr. Coyle found that plaintiff was at maximum medical improvement. (Id.). Dr. Coyle released plaintiff to return to work. (Tr. 203).

Plaintiff saw Dr. Brian Grus on December 27, 2007, with complaints of back pain. (Tr. 196). (Id.). It was noted that plaintiff was walking three miles a day, and played ice hockey. (Id.). Dr. Grus diagnosed plaintiff with degenerative disc disease.[8] (Tr. 197).

Plaintiff saw Dr. Coyle on March 4, 2008, for evaluation of back pain. (Tr. 213). Plaintiff reported that he had done well until two weeks prior, when he came down with the flu and

_____

[8]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See Medical Information Systems for Lawyers, § 6:201.

developed severe back pain. (Id.). Plaintiff complained of diffuse pain from the sacrum to the upper lumbar spine, with occasional tingling in the right buttock. (Id.). Plaintiff had no complaints of radicular pain. (Id.). Upon examination, plaintiff's motor strength and sensation were intact, there were no nerve root tension signs in the lower extremities, no palpable muscle spasm, and plaintiff was able to forward flex to about thirty degrees with increased pain. (Id.). X-rays revealed a mature fusion at L5-S1, and mild arthritic changes at L5 and L3-4. (Tr. 214). Dr. Coyle's impression was lumbar sprain. (Id.). He indicated that plaintiff had a history of prior lumbar sprains and that he was fairly muscular and very stiff in flexion and extension. (Id.). Dr. Coyle recommended a course of physical therapy, and anti-inflammatory medication. (Id.). Dr. Coyle indicated that the fusion was mature, and advised against pain medication. (Id.). Dr. Coyle stated that plaintiff remained at maximum medical improvement from his lumbar fusion. (Id.).

Plaintiff saw David Volarich, D.O., on March 11, 2008, for an independent medical examination in connection with his workers' compensation claim. (Tr. 296-307). It was noted that plaintiff was unable to return to work following his January 2007 work injury, and was eventually fired. (Tr. 297). Plaintiff reported that he had not worked since, but was looking for some type of work. (Id.). Plaintiff complained of constant back pain and infrequent radiating symptoms in the right leg. (Tr. 300). Plaintiff reported that he tries to walk four to five miles several days a week to lose weight, and that his back does not bother him while he is walking, but after he stops it feels fatigued, achy and weak. (Tr. 301). Plaintiff indicated that he was able to lift ten to fifteen pounds comfortably. (Id.). Upon examination, plaintiff was able to slowly walk

without foot drop, limp, or ataxia; heel and toe walk a couple of steps, with weakness in his right leg and pain in the right foot; tandem walk about six to eight steps; stand on the left foot without difficulty, but could only stand on the right foot for four to five seconds before losing balance and complaining of back discomfort; squat about two thirds of normal, stopping because of increased back pain; and had difficulty pushing off to stand back upright to an erect position. (Tr. 303). Plaintiff complained of pain in the low back with flexion, and palpation elicited pain in the midline over the L5 segment. (Id.). Upon straight leg raise testing, plaintiff complained of some burning in his left thigh on the left side at seventy degrees; on the right side at fifty degrees, he had a considerable increase in back pain as well as pain and burning that radiated into the posterior aspect of the right thigh into the right calf and into the right heel. (Id.). Dr. Volarich indicated that plaintiff had undergone a repeat MRI scan on March 12, 2007, which suggested an annular tear at L5-S1. (Tr. 304). Dr. Volarich diagnosed plaintiff with recurrent disc herniation at L5-S1 causing right leg radiculopathy,[9] and recurrent lumbar radicular syndrome. (Tr. 304-05). Dr. Volarich expressed the opinion that plaintiff's January 2007 work accident was the primary factor causing the recurrent disc herniation at L5-S1. (Tr. 305). Dr. Volarich stated that plaintiff had recently developed a recurrent lumbar radicular syndrome suspicious for juxtafusional herniation at the L4-5 level, which had not been evaluated or treated. (Id.). Dr. Volarich expressed the opinion that this additional disc pathology at L4-5 was directly related to the L5-S1 fusion. (Id.). Dr. Volarich recommended additional evaluation of plaintiff's low back, including MRI scan, to assess whether a juxtafusional herniation/stenosis has occurred at the L4-5 level; and pain

_____

[9]Disorder of the spinal nerve roots. Stedman's at 1622.

management, including epidural steroid injections, nerve root blocks, and trigger point injections.

(Id.). Dr. Volarich also recommended that plaintiff continue his walking program and limit

vigorous/heavy physical activity. (Tr. 306). Dr. Volarich stated that, if the MRI scan fails to

confirm additional disc pathology requiring surgical repair, then he recommends that plaintiff

undergo a work hardening program to help him get back to work. (Id.). Dr. Volarich noted that

plaintiff was able to perform most activities for self-care. (Id.).

In an Addendum dated April 15, 2009, Dr. Volarich stated that he re-examined plaintiff on

that date. (Tr. 310). Dr. Volarich indicated that plaintiff had undergone additional evaluations by

Dr. Coyle and, according to Dr. Coyle's February 11, 2009 report, plaintiff's fusion was solid and

there was no juxtafusional stenosis or herniation. (Id.). Plaintiff's radicular symptoms were not

nearly as severe as they were one year prior, and plaintiff only reported occasional radiating pain

to the right leg, although he continued to report significant low back pain that limited his daily

activities. (Id.). Dr. Volarich noted that Dr. Coyle noted no definite radicular symptoms in

February 2009. (Id.). Dr. Volarich indicated that Dr. Coyle obtained a repeat MRI and CT of the

lumbar spine, which revealed a solid fusion at L5-S1 with intact hardware nowhere near the L3-4

or L4-5 nerve roots, no evidence of nerve root compression at L3-4 or L5-S1, multilevel

degenerative facet arthropathy,[10] and minimal stenosis at L4-5. (Tr. 311). Dr. Volarich noted

that Dr. Coyle saw no indication for further treatment. (Id.). Dr. Volarich found that additional

surgery was not indicated at that time. (Tr. 313). Dr. Volarich recommended that plaintiff

undergo vocational assessment to determine how he might best get back to work. (Tr. 314). Dr.

Volarich expressed the opinion that plaintiff had the following work-related restrictions: avoid all

---

[10]Disease affecting the facet joints. Stedman's at 161.

bending, twisting, lifting, pushing, pulling, carrying, climbing, and other similar tasks to an as

needed basis; should not handle any weight greater than twenty pounds, and limit this to an

occasional basis assuming proper lifting techniques; should not handle weight over his head or

away from his body, nor should he carry weight over long distances or uneven terrain; avoid

remaining in a fixed position for any more than about thirty minute at a time including both sitting

and standing; and should change positions frequently to maximize comfort and rest when needed.

(Tr. 315).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity sine May 1, 2008, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairment: lumbar degenerative disc disease status-post fusion.

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).

5.    The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.    The claimant was born on June 17, 1956 and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because

applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since May 1, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-14).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on    May 1, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the   Social Security Act.

(Tr. 15).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf

v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B.     The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of

the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision,

although this is no longer required. <u>See</u> 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. <u>See</u> 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. <u>See</u> <u>id.</u> Next, the Commissioner must determine the severity of the impairment based on those ratings. <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. <u>See</u> <u>id.</u> If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.      Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erred in failing to obtain vocational expert testimony.  The undersigned will discuss plaintiff's claims in turn.

**1.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Specifically, plaintiff contends that, in determining plaintiff's residual functional capacity, the ALJ failed to properly consider the opinions of treating physician Dr. Coyle, and examining physician Dr. Volarich.

The ALJ found that plaintiff had the RFC to perform the full range of light work as defined in 20 CFR 416.967(b).  (Tr. 12).

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC.  Id.  As noted, an RFC is based on all relevant evidence, but it "remains

a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff first claims that the ALJ failed to properly consider the restrictions of plaintiff's treating surgeon, Dr. James Coyle. Specifically, plaintiff contends that Dr. Coyle limited plaintiff to no lifting over twenty-five pounds, and no repetitive bending over forty degrees in August 2007. Plaintiff also points out that, in March 2008, Dr. Coyle noted that plaintiff had a history of lumbar sprains and required pain management services.

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little, the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

The ALJ properly analyzed the opinion of Dr. Coyle. Plaintiff contends that the ALJ's RFC determination that plaintiff was capable of a full range of light work activity did not consider the restrictions assessed by Dr. Coyle in August 2007. On September 24, 2007, however, plaintiff reported to Dr. Coyle that he was doing very well, was ready to return to work, and did not want or require any restrictions. (Tr. 215). Dr. Coyle found that plaintiff was at maximum medical improvement and released plaintiff to return to work with no restrictions. (Tr. 215, 203). As such, it is clear that the restrictions Dr. Coyle imposed in August 2007 were temporary. Although plaintiff subsequently complained of back pain due to a lumbar strain in March 2008, Dr. Coyle advised against pain medication and found that plaintiff remained at maximum medical improvement from his lumbar fusion. (Tr. 214). Further, Dr. Volarich's report indicates that plaintiff saw Dr. Coyle in

February 2009, at which time Dr. Coyle noted no radicular symptoms, a solid fusion, and no evidence of nerve root compression. (Tr. 311). Dr. Coyle indicated that he saw no indication for further treatment at that time. (Tr. 313). Dr. Coyle did not impose any functional limitations after August 2007. Thus, the ALJ properly excluded the temporary restrictions imposed by Dr. Coyle in August 2007 in determining plaintiff's RFC.

Plaintiff also argues that the ALJ erred in failing to include the limitations found by examining physician Dr. Volarich. On April 15, 2009, Dr. Volarich expressed the opinion that plaintiff could return to work with the following restrictions: avoid all bending, twisting, lifting, pushing, pulling, carrying, climbing, and other similar tasks to an as needed basis; should not handle any weight greater than twenty pounds, and limit this to an occasional basis assuming proper lifting techniques; should not handle weight over his head or away from his body, nor should he carry weight over long distances or uneven terrain; avoid remaining in a fixed position for any more than about thirty minute at a time including both sitting and standing; and should change positions frequently to maximize comfort and rest when needed. (Tr. 315).

The ALJ indicated that she was assigning "little weight" to Dr. Volarich's opinion. (Tr. 13). The ALJ pointed out that plaintiff had been examined by treating physician Dr. Coyle shortly before Dr. Volarich rendered his opinion and Dr. Coyle found that plaintiff was doing well and had no radicular symptoms. (Tr. 13, 310). The ALJ found that Dr. Volarich's opinion was prepared for litigation and was inconsistent with the record as a whole. (Tr. 13). The ALJ noted that a treating physician's opinion is generally entitled to substantial weight. (Id.).

The undersigned finds that the ALJ provided sufficient reasons for assigning little weight to Dr. Volarich's opinion. The ALJ reasonably accorded more weight to the opinion of Dr. Coyle, who

was plaintiff's treating surgeon and had seen plaintiff many times, than the opinion of Dr. Volarich, who had seen plaintiff only twice in connection with plaintiff's workers' compensation claim. See 20 C.F.R. § 404.1527(d) (factors to consider in weighing medical opinions). See also Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991) (treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight). Dr. Coyle's treatment notes indicate that plaintiff's back significantly improved following surgery. Physical examinations consistently revealed good motor strength in both lower extremities and normal sensation (Tr. 221, 219, 218, 217, 216). Plaintiff's x-rays revealed a solid, mature fusion. (Tr. 215). Plaintiff was taking no pain medication and was walking a mile-and-a-half daily six weeks post-surgery. (Tr. 221). Plaintiff was walking three miles daily in July 2007. (Tr. 218). In September 2007, plaintiff reported that he did not require any restrictions, and Dr. Coyle released plaintiff to work with no restrictions. (Tr. 215).

In determining plaintiff's RFC, the ALJ also performed a proper credibility analysis. (Tr. 13). The ALJ found that plaintiff was "not a credible witness." (Tr. 13). The ALJ first pointed out that plaintiff took only over-the-counter medication for pain. A lack of strong pain medication is inconsistent with subjective complaints of disabling pain. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

The ALJ noted that she observed plaintiff walking easily at the hearing, getting into his car easily, and driving away without difficulty. (Tr. 13). "While the ALJ's observations cannot be the sole basis of h[er] decision, it is not error to include h[er] observations as one of several factors." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008).

The ALJ next pointed out that plaintiff was playing ice hockey and walking three miles per day in December 2007. (Tr. 13, 196). Significant daily activities may be inconsistent with claims of

disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's ability to walk three miles a day and play ice hockey after his alleged onset of disability date detracted from the credibility of his complaints of disabling pain.

Finally, the ALJ pointed out that the objective medical evidence does not support plaintiff's subjective complaints.  Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility.  See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003).  As previously discussed, the objective evidence reveals that plaintiff's back pain significantly improved following surgery.  The ALJ also pointed out that no doctor has expressed the opinion that plaintiff is disabled or unable to work.

The undersigned finds that the ALJ's RFC determination is supported by substantial evidence. The ALJ's RFC is supported by the opinion of treating physician Dr. Coyle, who released plaintiff to work with no restrictions in September 2007.  In addition, treatment notes of Dr. Brian Grus reveal that in December 2007, plaintiff reported walking three miles daily, and playing ice hockey two times daily. (Tr. 197).  As such, the objective medical evidence is consistent with the ability to perform the full range of light work.  Further, as previously discussed, the ALJ performed a proper credibility analysis and found that plaintiff's allegations of disabling pain were not entirely credible.  Thus, the ALJ's RFC determination is supported by substantial evidence in the record as a whole.


2.      **Vocational Expert Testimony**

Plaintiff finally argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the ALJ failed to properly consider plaintiff's pain

- 24 -

and other nonexertional impairments found by Dr. Volarich. Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error. Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances. See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Id. (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics identically match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform

gainful activity, the grid cannot take the place of expert vocational testimony." Id. (alteration in original) (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "However, if the ALJ finds that the claimant's nonexertional impairment does not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities, the ALJ may apply the Guidelines in spite of a nonexertional impairment." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

Here, the ALJ's use of the grids was permissible. The ALJ performed a proper credibility analysis and found that plaintiff's pain did not prevent him from performing the full range of light work. As discussed above, the ALJ found that Dr. Volarich's opinion was entitled to little weight because it was inconsistent with the medical record. The undersigned has found that the ALJ's determination that plaintiff was capable of performing the full range of light work is supported by substantial evidence. As such, the ALJ's use of the grids to find that plaintiff could perform a significant number of jobs in the national economy is supported by substantial evidence.

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record supports the ALJ's finding that plaintiff was capable of performing a significant number of jobs in the national economy. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this 15th day of March, 2012.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE